On Applications for Rehearing

LYONS, Justice.
The opinion of July 17, 2009, is withdrawn, and the following is substituted therefor.
Helen Kathryn Wheeler and William Newton Phillips, as trustee under the Doris R.H. Phillips Revocable Living Trust Agreement dated February 21, 2001 (“Wheeler/Phillips”), and Southdale, LLC, the plaintiffs in the trial court, appeal from summary judgments entered in favor of all the appellees in case no. 1070484 and case no. 1070487, the defendants in the trial court. Those appellees are the Industrial Development Board of the City of Montgomery (“the IDB”); Reuben F. Thornton, Jr., individually and as chairman of the IDB; the City of Montgomery (“the City”); Bobby N. Bright, individually and as mayor of the City;[1] Montgomery County (“the County”); the Montgomery County Commission (“the County Commission”); William F. Joseph, Jr., individually and as chairman of the County Commission; the Alabama Incentives Finance Authority (“the AIFA”); Don Siegelman, individually and as former president of the AIFA;[2] Henry C. Mabry III, individually and as former secretary of the AIFA;[3] CSX Transportation, Inc., and CSX Real Property, Inc. (“CSX”); David W. Hemp-hill, an assistant vice president of CSX Transportation; J. Randall Evans, a vice president of CSX Transportation; Hyundai Motor Manufacturing Alabama, LLC, and Hyundai Motor America (“Hyundai”); [4] and Todd Strange, individually and in his official capacity as the current may- or of the City.[5] The appellees will hereinafter sometimes be referred to collectively as “the project participants.” Southdale and Wheeler/Phillips also sued the Montgomery Area Chamber of Commerce (“the MACOC”); Randall L. George, individually and as president of the MACOC; and David Echols, a former employee of the Alabama Development Office (“the ADO”), *1069 but they were dismissed by stipulation and are not appellees. In case no. 1070514, Strange cross-appeals from the trial court’s order denying his motion to dismiss. In case no. 1070484 and case no. 1070487, we affirm in part, reverse in part, and remand; in case no. 1070514, we affirm.
I. Factual Background and Procedural History
In June 2001, a representative of Hyundai, a Korean automobile manufacturer, contacted Echols, who at that time worked for the ADO, expressing Hyundai’s interest in locating an automobile-assembly plant in the United States and requesting information regarding incentives and available locations in Alabama that could accommodate a large automobile-manufacturing facility. Hyundai was considering at least two sites in Alabama-Montgomery and Opelika-as well as sites in several other states, including Kentucky. Hyundai’s identity was kept secret during the initial negotiations. In September 2001, officials from the City, the IDB, the County Commission, and the MACOC began making preparations to secure options to purchase property in the Montgomery area in an effort to create an incentive package they hoped would persuade Hyundai to locate its plant near Montgomery. A significant parcel of land was an essential component of any incentive package. B.M. Ahn, the Hyundai representative in charge of the site selection for the United States plant, testified during his deposition that a critical element of an incentive package offered to an automobile manufacturer was “free land” on which to locate its plant. Ahn also stated that Hyundai had no role in acquiring the land and that land acquisition for an incentive package was the responsibility of the city or the state putting the package together. Officials of the City, the County Commission, and the IDB signed a letter of intent stating that they, “in partnership with the State,” would commit to provide an industrial site at no cost to Hyundai. Joseph, as chairman of the County Commission, was responsible for coordinating with City and County officials to develop the incentive package offered to Hyundai.
The City was to provide 62.5% of the funds to purchase the property; the County was to provide 37.5% of those funds. However, the option agreements on the parcels of property that would be included in the proposed Hyundai plant site were acquired by the IDB. Thornton testified that the IDB’s primary role in industrial projects is to “serve as the entity through which monies flow for the purchase of land for the ultimate use in industry.” He further stated that the IDB is involved in such a process “to comply with state and federal tax laws for the tax breaks and other incentives to the industry.”
Over the course of several months, the IDB secured options on six parcels of property for the industrial site. At that time, the IDB did not disclose Hyundai’s identity to the landowners. Neither Wheeler nor Phillips resided in Alabama; they retained Jesse Williams, a lawyer with the Montgomery law firm of Rushton, Stakely, Johnston & Garrett, P.A., to represent their interests. In September 2001, Thornton, in his capacity as chairman of the IDB, executed' option agreements on behalf of the IDB for four of the six parcels. The IDB agreed to purchase approximately 320 acres from Southdale; approximately 807 acres from Wheeler/Phillips; approximately 328 acres from George E. Russell and Thomas E. Russell, as coexec-utors and cotrustees of the will and testamentary trust of Earnest W. Russell, and Myrtis Russell (“the Russells”); and approximately 40 acres from John C. Parker and Eugenia M. Parker (“the Parkers”). *1070 These agreements provided for an option period of 120 days, and each stated:
“3. If Purchaser elects to exercise this Option the purchase price for the Property shall be determined as follows:
“Seller and Purchaser shall each, at its own cost and expense, secure a current appraisal of the Property. The purchase price shall be the average of the two appraisals provided, however, in no event shall the purchase price be less than $4,500 per acre and further provided that the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for this Property. The acreage shall be determined by a good and accurate survey provided by Purchaser.
[[Image here]]
“16. This Option constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Option and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.”
(Emphasis added.) The parties refer to the provision in the option agreements that “the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property” as a “most-favored-nation clause.” The purpose of the clause, as explained by Wheeler/Phillips and Southdale, was to ensure that all landowners conveying property to be used for the project would receive the same price so that no one parcel of land would be worth more than any other parcel.' The most-favored-nation clause allowed Alabama officials to obtain control of the needed land quickly, because landowners who executed option agreements early in the acquisition period were assured that they would not receive less than a landowner who might hold out until the deadline in order to seek a higher price. Officials in Kentucky were having difficulty securing the land needed for the proposed site in Kentucky because some landowners were negotiating for a higher sales price by refusing to execute option agreements before the deadline for submitting the incentive package. At the time the option agreements were being entered into in Alabama, lawsuits had already been filed in Kentucky concerning the land acquisition for the proposed site there.
In early 2002, Southdale, Wheeler/Phillips, the Russells, and the Parkers amended their option agreements to extend the option period to May 31, 2002. Each amended option agreement stated:
“1. It is hereby agreed that the purchase price for the Property is Four Thousand Five Hundred and No/100 Dollars ($4,500.00) per acre. The exact number of acres to be determined by the survey provided by Purchaser.
“2. The option period is hereby extended for a period of 120 days from the Effective Date of the Option, which Effective Date is October 3, 2001. The expiration date of the Option, as extended, is now May 31, 2002.
“3. Except as amended hereby, the Option is in all other respects ratified and confirmed.”
The amended options were executed by Southdale and Wheeler/Phillips on January 31, 2002; by the Parkers on February 1, 2002; and by the Russells on February 4, 2002.
*1071 On February 22 and March 8, 2002, respectively, Thornton executed two additional option agreements on behalf of the IDB to purchase approximately 54 acres from Price McLemore, Mary H. McLe-more, John Mclnnis, Jr., Timothy N. Mclnnis, Charles R. Mclnnis, Williams S. Newell, and the Peoples Bank and Trust Company, as trustee for the Adaline Hooper Trust A and B (“the McLemore group”), and approximately 88 acres from Pelzer Homes, Inc. The terms of the option agreements, executed in early 2002, are identical to the terms of the option agreements executed in September 2001. The IDB later assigned its rights under all the option agreements to the City and the County.
During the time in which the IDB was acquiring the options from the six above-referenced landowners, representatives of the MACOC approached Joy Shelton, a neighboring landowner, about an option to purchase her property; however, Shelton declined to enter into an option agreement. Sometime during February 2002, Hyundai inquired of City and County officials whether it would be possible to “square off’ the property made available for the potential plant site. Ellen McNair, an employee of the MACOC, met with Shelton to ask whether her property was for sale and whether she would accept a purchase price of $4,500 per acre. McNair said that Shelton was interested in selling but that she would not sell for that price. McNair made additional telephone calls to Shelton, but Shelton continued to refuse to sell her property. By mid March 2002, the IDB decided that the Shelton property was not necessary for the incentive package. In addition, officials for the City and the County, already committed to spending $16 million and $9 million, respectively, decided that they would not designate- any additional funds for the purchase of land for the proposed site. The City and the County Commission then presented an incentive package, including the proposed plant site near Montgomery consisting of the acreage subject to the option agreements, to Hyundai for consideration. The State also drafted and assembled an incentive package that would be offered to Hyundai if it chose to build its plant in Alabama, either in Montgomery or in Ope-lika.
On the evening of March 28, 2002, Ahn telephoned Strange, who was at that time the director of the ADO. Ahn told Strange that Hyundai was in the process of deciding whether to locate its United States plant in Alabama or Kentucky, a decision it would announce on April 1. He informed Strange that Hyundai would need additional property for the railway access Hyundai desired if Montgomery were to be selected for the project site and that if the additional land could not be acquired, “you might lose the deal.” The additional property Hyundai was requesting was the land owned by Shelton. Ahn informed Strange that he would need to know by noon the next day whether the additional property could be acquired.
Strange met during the late evening hours of March 28 with George, McNair, Echols, Steve Cawood (an engineer working on the project), and Buddy Morgan (chairman of the Water Works and Sanitary Sewer Board of the City of Montgomery) to discuss Hyundai’s request. The group also consulted by telephone with Scott Abney, a lawyer with the Birmingham law firm of Maynard, Cooper & Gale, P.C., who had been hired to advise then Governor Siegelman and then Finance Director Mabry. The group meeting with Strange recognized that the City and the County would not make any additional funds available- for the purchase of land and that the six option agreements already acquired contained most-favored-nation *1072 clauses. George testified that the most-favored-nation clause was discussed.
“But that evening on the 28th, it was — it was mentioned in the context that if we as locals bought it, it could be — it could be a problem.”
Strange testified that he learned of the most-favored-nation clause during that meeting. The group discussed whether having CSX purchase the land would trigger the most-favored-nation clause, or whether a purchase by CSX would be separate from the other options. Strange testified:
“It was our understanding that if CSX would purchase the property, that they would not be a party to the original purchase and therefore it would be outside that agreement.”
Strange left the meeting and telephoned a representative of CSX to discuss whether CSX would be willing to purchase the additional property because Ahn had stated that the property would be necessary for railway service. CSX’s representative in Birmingham, John Sanford, advised Strange to contact Hemphill, an assistant vice president in CSX’s Industrial and Economic Development Department. Because Hemphill was not available when Strange placed his telephone call, Strange left a message and then telephoned Hemp-hill’s superior, Evans, the vice president for CSX in charge of real-estate and industrial development. According to Evans, Strange told him that Hyundai had made a last-minute change in the rail configuration and asked him whether CSX could purchase the additional property required if the State reimbursed CSX for the amount of the purchase. Evans testified that he did not question why Strange wanted CSX to purchase the property if CSX were going to be reimbursed by the State for the purchase and that his only concern at the time was ensuring that CSX would be reimbursed if it participated in the purchase. George testified that Strange then returned to the meeting and announced to those present, “it’s handled” and “CSX would accommodate our need.” Strange then telephoned Ahn in Korea and told him that obtaining the additional land necessary to accommodate Hyundai “appeared that it would be a doable situation.” Later in the evening, after speaking with Sanford and Evans, Hemphill returned Strange’s telephone call, and they had a further discussion regarding CSX’s purchase of the additional land.
On March 29, 2002, Hemphill sent the following e-mail to Echols:
“Regarding the [Shelton property] that will need to be purchased, you asked if CSX would be willing to buy this property for the State and Montgomery at approximately $8,000.00 an acre. There is no contract or option on the property currently and you estimate it will cost us approximately $750,000.00 which you are willing to refund to us in some fashion during the track construction phase. Randy Evans, in principle agreed to this and I ask that you fax us a letter outlining exactly what you have in mind. The purpose of doing it this way rather than what you did in getting control of the other 1600 acres is to avoid paying the other landowners $8,000.00 an acre which would have a negative impact of $10,000,000.00 on the site cost. The railroad does not get good land values in a situation like this and so I think there will be upward pressure on that $8,000 number. Moreover, the other landowners will get wind of this ploy and may create negative community publicity.... In your letter to us we would ask that you indicate exactly how you intend to pay us during the track work construction.”
*1073 The Hemphill e-mail shows a copy to Strange, but Strange testified that he did not see the e-mail until after the action had been filed in this case. However, Echols stated that he asked Strange to respond to Hemphill’s e-mail with a letter, which Strange drafted and sent. When asked why CSX went along with the plan for it to purchase the Shelton property, Hemphill testified that it did so because CSX was concerned that if it did not go along with the plan, Montgomery could lose the project, and CSX would thereby lose the potential for extensive railway business with Hyundai.
On March 29, 2002, Strange faxed Hemphill the following letter:
“Last evening, Thursday, March 28, 2002, at 6:05 p.m. Central Standard Time, I received a call from Mr. B.M. Ahn, President Hyundai Motor Company, U.S. from Seoul, Korea. He told me they were in the final stages of the decision and needed to make modifications to their Montgomery site layout because the CSX Railroad yard estimate had come in extremely high. In their (Hyundai’s) redesign, he wanted to do parallel tracks running north and south on the eastern side of the property boundary. His engineers told him he would not have enough room unless [additional property was] obtained in the southeast corner of the quadrant. This property had been discussed a couple of months ago but we had been told as recently as two weeks ago that it would not be necessary. So accordingly, we did not pursue any options....
“As I indicated to you last night, our option agreements have a ‘most favored nation’ clause where we agreed to pay no more for any one parcel than any of the other parcels. Accordingly, I assembled a working group of the local Chamber of Commerce executives, engineering expertise, Dave Echols and myself. We decided the most appropriate course to follow would be to ask CSX to obtain a parcel for rail access to keep it outside the project agreement. As you know CSX’s agreement with Hyundai is separate and this property in their view is for rail access only.....
[[Image here]]
“Dave, as you can appreciate there are a lot of details to be worked out, but the spirit and concept is for CSX to obtain the needed parcel for rail access and whatever the purchase price, CSX would be made whole in a manner we mutually agreed upon.”
Strange’s letter indicated that copies were sent to then Governor Siegelman, then Finance Director Mabry, Abney, and George.
On the morning of March 29, George asked then Mayor Bright to meet with Shelton and her family in an effort to obtain an option on the property Hyundai had requested on the previous evening. Shelton’s parents knew and liked Bright, and he was seen as the person who could most likely persuade Shelton to sell her land. Before Bright agreed to meet with Shelton, he reiterated to Strange and others that the City and County stood firm in refusing to pay additional money toward the project; Bright was assured that the City and County would not be expected to contribute any funds toward the purchase of the Shelton property and that the option would be assigned to either CSX or the State. Bright testified that he agreed to obtain the option because it was “important to me to lend my credibility to the transaction.” Bright, McNair, and George met with Shelton and presented her with an option agreement containing a blank line indicating the purchase price of the property. Shelton filled in the blank with the amount $12,000 per acre; ■ Bright executed the assignable option on behalf of *1074 the City. Strange carne to the MACOC offices to get the option agreement, which he then faxed to Hyundai. He did not inform Ahn that CSX was to be the entity that actually purchased the Shelton property.
McNair testified that after returning from meeting with Shelton, she became concerned that the most-favored-nation clause might be implicated as a result of the option obtained from Shelton. She informed Thomas H. Gallion III, the attorney for the IDB, and Frank McPhillips, another lawyer with Maynard, Cooper & Gale, P.C., about the Shelton option. During her deposition, McNair stated:
“On Friday when ... I came back from visiting with Mrs. Shelton, I contacted both Mr. Gallion and Mr. McPhillips [one of the attorneys for the State involved in the Hyundai project]. My concern was ... just to let them know what had happened, you know, with Thursday night because it happened so fast. They were not aware of it until after the fact, so I wanted to tell them what had happened.
“But also I was just a little concerned with [Mayor Bright] taking out the option — because he was a local person, and his action of just taking out the option which would be assigned to CSX or somebody, that just made me a little nervous.
“So I just said — you know, I was, you know, just calling them just to be sure that that wouldn’t trigger any — you know, we just didn’t know whether or not that would, and so I just wanted to be sure. So I contacted both of them.”
On the morning of March 29, Strange telephoned then Finance Director Mabry regarding Hyundai’s need for additional land. Mabry said that Strange told him that CSX was willing to assist in the purchase of the property but that it might be necessary for the State to provide funds to purchase the property. Mabry consulted with then Governor Siegelman, who approved the use of State funds for the purchase, if necessary. Neither Mabry nor then Governor Siegelman was advised at that time that Strange and CSX had entered into an agreement to have CSX reimbursed for any funds it provided to obtain the Shelton property. Also on the morning of March 29, Abney and McPhil-lips were informed that Bright had executed an option agreement with Shelton to purchase her property at $12,000 per acre. Abney and McPhillips reviewed all the option agreements and determined that nothing in them prevented the State from assisting in the purchase of the Shelton property. They advised Mabry that because the State was not a party to the option agreements the purchase of the Shelton property by the State would not trigger the most-favored-nation clause contained in the other option agreements. Abney and McPhillips then incorporated the purchase of the Shelton property into the draft of a project agreement with Hyundai detailing the location and development of the plant (“the project agreement”).
On April 1, 2002, Hyundai announced that it had selected Montgomery as the site on which it would build its automobile-manufacturing facility. On April 8, George met with Judge Reese McKinney, a shareholder in Southdale, and Williams, the attorney representing Wheeler/Phillips, to inform them of the recently obtained option on the Shelton property. George testified that he told McKinney and Williams that Bright had executed an assignable option, that he gave them a copy of the Shelton option agreement, and that “CSX had agreed to help us resolve the problem by what I understood to be was the acquisition of this property after *1075 they had done, of course, due diligence for that.” McKinney testified that George told him that CSX needed the property and satisfied his concerns because, he said, George explained that “the rail yard purchased by CSX did not relate to our [Southdale’s] agreement.” Williams also testified that George explained that the Shelton option would be assigned to CSX because of the location of the rail yard. Although George was aware of Hyundai’s request in February 2002 to “square off the property” and of McNair’s attempt to obtain Shelton’s land at that time, he did not tell McKinney and Williams about that request; instead, he testified that he informed them “that CSX was going to buy the property.” George testified that when he left the meeting at MACOC’s offices on the evening of March 28, it was his understanding that CSX was going to purchase the Shelton property and that if he had known the State was going to reimburse CSX for the purchase price, he would have conveyed that information to McKinney and Williams.
Evans testified that he first learned of Strange’s March 29 letter and Hemphill’s March 29 e-mail when he read them on his way to a meeting with Strange in April 2002. He stated that he became concerned and asked Strange about the most-favored-nation clause in the option agreements, but he said that Strange told him the purchase of the Shelton property would be a separate transaction and that George had already explained to the other landowners that the purchase of the Shelton property was to be “a railroad project.” Evans testified that his concerns were satisfied when Strange told him that George had informed the other option holders- that CSX “had committed to make that purchase.”
On April 15, 2002, the State, acting through then Governor Siegelman in his official capacity; the City, acting through then Mayor Bright in his official capacity; the County Commission, acting through Joseph in his official capacity; and the IDB, acting through Thornton in his official capacity, entered into the project agreement.[6] Section 3.1 of Article 8 of the project agreement stated that “the Montgomery IDB presently holds purchase options necessary to acquire fee simple title to each parcel of real estate comprising the Project Site.” Section 3.4 of the project agreement further provided that the IDB was to exercise each option; section 3.6(a) provided that the IDB was then to transfer title of the property acquired by the exercise of the options to Hyundai. Section 3.20 of the project agreement, entitled “CSX Agreement,” provided for the acquisition of the Shelton property:
“The State and Local Governments shall use their best efforts to cause CSX Transportation to enter into an agreement with [Hyundai] in form satisfactory to [Hyundai], which will provide for rail service for [Hyundai] on terms and conditions as favorable to [Hyundai] as those offered to other automobile manufacturers. In addition, the State and City shall use their best efforts to cause CSX Transportation to provide the incentives set forth in the letter from CSX Transportation dated December 17, 2001. The State represents and warrants that [Hyundai] will acquire fee simple title to [the Shelton property] for use in connection with construction of a rail switch yard by or before September 30, 2002. If and to the extent [Hyundai] *1076 makes any payment for the cost of acquiring such acreage, the State shall reimburse [Hyundai] for such costs by increasing by an equivalent amount the monies made available from the State in Training Equipment Fund pursuant to Article 4 by no later than the last quarter of the calendar year 2003. The City agrees that it will zone such additional acreage the same as the Project Site. The Local Governments agree to abate taxes that are applicable to such additional acreage in the same manner and to the same extent as ... abatement of taxes of the Project Site.”
The IDB assigned the options it held on the property owned by Southdale, Wheeler/Phillips, the Russells, the Parkers, the McLemore group, and Pelzer Homes to the City and the County. In mid May 2002, the City and the County purchased the property for $4,500 per acre. The City and the County then deeded the property to the IDB, which in turn deeded the property to Hyundai. The City never exercised the option it held on the Shelton property.
Despite the discussion in the late evening of March 28 about CSX’s purchasing the Shelton property, then Finance Director Mabry was reluctant to have the State reimburse CSX directly because CSX would be expected to profit from its relationship with Hyundai. When Hyundai learned that CSX, not the State, would be purchasing the property for the rail installation and that Hyundai would be expected to enter into a long-term contract with CSX, Hyundai decided to install the rail using its own funds. On May 22, 2002, Mabry, in his capacity as the director of finance, sent AJhn a letter confirming that the State would be funding the purchase of the Shelton property. Mabry’s letter stated:
“This is to confirm that the State of Alabama will provide the funding for the purchase of the 93 acres set aside for Hyundai’s rail yard on the date of closing. This will obviate any need for Hyundai to borrow to pay for this acquisition. In addition, the State will pay the reasonable due diligence costs incurred in connection with Hyundai’s acquisition of this property. This letter of assurance is being provided to you pursuant to Section 3.20 of the Project Agreement.”
The option on the Shelton property was never exercised by the City, and it expired on May 31, 2002. Also on May 31, CSX executed a real-estate sales contract for the purchase of the Shelton property at $12,000 per acre. As a result of Hyundai’s decision not to involve CSX in the rail installation, CSX assigned the real-estate contract to Hyundai on May 28, 2002, three days before the real-estate contract between CSX and Shelton was executed.
On June 14, 2002, Mabry and then Governor Siegelman convened a meeting of the AIFA, at which the AIFA voted to pay $1.3 million “for the acquisition of rail switch yard property for Hyundai.” Because the funds for the purchase of the Shelton property were related to a commitment made to an industry locating in Alabama, bond proceeds held by the AIFA were used to fund the purchase of the property. On July 12, 2002, funds from the AIFA were transferred to Hyundai, and Hyundai used those funds to purchase the Shelton property. The closing on the Shelton property occurred in August 2002.
After all the land had been acquired and deeded to Hyundai, Hyundai leased all the property, including the Shelton property, to the IDB so that the Alabama Department of Transportation (“ALDOT”) could perform site preparation on the property. Additionally, the IDB entered into an *1077 agreement with Hyundai providing that Hyundai’s property was to receive the previously agreed upon abatement from ad valorem taxation and other tax incentives provided as a part of the incentive package. The Shelton property was included in the tax-abatement agreement.
On May 28, 2004, Southdale and Wheeler/Phillips filed an action in the Montgomery Circuit Court against the IDB, Thornton, the City, Bright, the County, Joseph, the AIFA, then Governor Siegelman, then Finance Director Mabry, CSX Transportation, Inc., Hyundai, the MACOC, and George, alleging fraud, suppression, breach of contract, rescission, and conspiracy arising out of the sale of their land. Specifically, they alleged that the defendants had conspired to purchase the Shelton property at a higher price than was paid for their property and that the defendants did- so to avoid complying with the most-favored-nation clause contained in all the option agreements. Southdale and Wheeler/Phillips filed an amended complaint on August 20, 2004, naming the same defendants, stating the same claims, and making only minor revisions to the complaint. Southdale and Wheeler/Phillips filed a second amended complaint on February 22, 2005, substituting CSX Real Property, Inc., Hemphill, Evans, Strange, and Echols for the fictitiously named defendants identified in the earlier complaints and adding an additional claim of intentional fraud and suppression. On November 21, 2005, the trial court dismissed George and the MACOC pursuant to a stipulation between the parties. On February 22, 2006, the trial court entered a summary judgment in favor of Bright on the basis of State-agent immunity, dismissed Echols pursuant to a stipulation of the parties, and denied Strange’s motion to dismiss the claims against him on the ground of immunity.
Less than a week before this case was to be tried, the project participants remaining in the case after Bright was removed (“the remaining project participants”) filed a motion to disqualify the law firm representing Southdale in this litigation, the Montgomery law firm of Jemison, Mendelsohn & James, P.C., on the basis that a member of that law firm, Lee Miller, appeared to have provided legal advice regarding purchase of the Shelton property during his employment with the legal division of the State Finance Department before he joined the law firm. The remaining project participants also moved to disqualify the law firm representing Wheeler/Phillips, the Birmingham firm of Spain & Gillon, L.L.C., on the basis that Miller had provided documents to them. The trial court granted the motions to disqualify both law firms. Wheeler/Phillips petitioned this Court for a. writ of- mandamus directing the trial court to vacate its order disqualifying their counsel in this litigation. This Court granted Wheeler/Phillips’s petition and issued the writ. See Ex parte Wheeler, 978 So.2d 1 (Ala.2007). Southdale obtained new counsel, and the case proceeded.
On November 2, 2007, the trial court entered a summary judgment in favor of the remaining project participants on Southdale and Wheeler/Phillips’s tort claims on the basis that those tort claims were barred by the applicable statute of limitations. On November 20, 2007, the trial court entered a summary judgment in favor of the remaining project participants on all remaining claims. Southdale and Wheeler/Phillips appeal from the summary judgments. Southdale also appeals from an order of the trial court requiring it to pay the special-master fee in connection with- the motion to disqualify its counsel. Wheeler/Phillips also appeal from an order of the trial court requiring them to produce in discovery materials they consider *1078 to be subject to the attorney-client privilege. Strange cross-appeals from the order denying his motion to dismiss grounded on State and State-agent immunity.
The Russells and the McLemore group also filed legal actions as a result of these transactions. They each sued the IDB and Hyundai, alleging breach of contract, specifically stating that the IDB and Hyundai had breached the most-favored-nation clause in their option agreements by not paying them $12,000 per acre for their property, the price Shelton was paid. The trial court entered summary judgments in favor of the IDB and Hyundai, and thé Russells and the McLemore group appealed. This Court affirmed the trial court’s judgment in part and reversed it in part. See McLemore v. Hyundai Motor Mfg. Alabama, LLC, 7 So.3d 318 (Ala.2008). Our decision in that case controls some of the issues raised in this case.
II. Standard of Review

A.Summary Judgment

The standard by which this Court will review a motion for summary judgment is well established:
“ ‘The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that-the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present “substantial evidence” creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); § 12-21-12(d)[,] Ala.Code 1975. Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
“ ‘In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala.1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).’ ”
Payton v. Monsanto Co., 801 So.2d 829, 832-33 (Ala.2001) (quoting Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala.1999)).

B.Discovery Order

Our standard of review in matters involving discovery is limited to determining whether the trial court exceeded its discretion in making its discovery decision. Rankin v. First Nat’l Bank of Alabama, 437 So.2d 503 (Ala.1983). An appellate court will not reverse the trial court’s decision regarding a discovery matter unless there is a clear showing that the trial court exceeded its discretion. Ex parte McTier, 414 So.2d. 460 (Ala.1982).

C.Special-Master Fee

 The decision whether to award a special-master fee as an element of costs is within the sound discretion of the trial court. An appellate court will reverse the trial court’s ruling on that question only upon a showing that the taxation of costs was unjust and unfair. City of Birmingham v. City of Fairfield, 396 So.2d 692, 697 (Ala.1981).
III. Summary Judgment as to Breach-of-Contract Claims
In McLemore v. Hyundai Motor Manufacturing, LLC, supra, we dealt with *1079 option agreements identical to the option agreements executed in the underlying-case. The IDB argued in McLemore, as do the project participants here, that the 2002 amendment to the option agreement waived the most-favored-nation clause in the original option agreement. Southdale and Wheeler/Phillips argue, as did the Russells, that the amendment of the option agreements did not waive the most-favored-nation clause.
Southdale and Wheeler/Phillips contend that the sole purpose of the amendment to the option agreement was to extend the date of the option 120 days past the February 2002 expiration date of the original option agreement. Because the amendment to the option agreement did not specifically delete or waive the most-favored-nation clause, they argue, the clause remained in effect. Southdale and Wheeler/Phillips rely on language in the amended option agreement providing that, “[ejxcept as amended hereby, the Option is in all other respects ratified and confirmed,” and language in the original option agreement providing that “no waiver of any of [the] terms and conditions [of the option agreement] shall be effective unless made in writing and duly executed by the parties” to the option agreement. They insist that because the amendment to the option agreement did not specifically delete or waive the most-favored-nation clause, that clause remains enforceable. The project participants contend that because the language in the amendment to the option agreement as to the purchase price is unambiguous and establishes a definite purchase price of $4,500 per acre, the most-favored-nation clause was eliminated from the option agreements between the IDB and Southdale and between the IDB and Wheeler/Phillips.
We reversed the summary judgment for the IDB as to the Russells’ breach-of-contract claim in McLemore, stating:
“We hold that the terms of the amendment to the option agreement are not ‘definite and certain’ as to waiver of the most-favored-nation clause in the original option agreement. The language of the original option agreement specifically provided that for a waiver of a term of the agreement to be effective, the waiver must be in writing, and executed by both parties. Although the language in the amendment to the option agreement sets forth the price per acre at $4,500, we cannot conclude that the language in the amended option as a matter of law modified or waived the most-favored-nation clause in the Russells’ original option agreement. Therefore, a question for the jury exists as to whether the amended option agreement modified or waived the most-favored-nation clause in the Russells’ original option agreement, and a summary judgment for the IDB and against the Russells on this ground is not proper.”
7 So.3d at 334. Based oh our holding in McLemore, we likewise hold in this case that whether the amendment to the option agreements modified or waived the most-favored-nation clause in Southdale’s and Wheeler/Phillips’s original option agreements is a question to resolved by the jury, and a summary judgment on this ground was error.
We also .addressed in McLemore arguments made by the Russells and the McLemore group that the trial court erred in entering a summary judgment on their breach-of-contract claim because, they said, a genuine issue of material fact exists as to the meaning and application of the most-favored-nation clause in the option agreements. In McLemore, the IDB argued that under the doctrine of merger the option agreements had no effect once the *1080 deeds were executed and delivered. We stated in McLemore:
“Thus, the mere execution and delivery of a deed does not merge the consideration in the contract of sale into the deed. As we stated in Lipscomb v. Tucker, 294 Ala. 246, 256, 314 So.2d 840, 848 (1975):
“ ‘If the receipt of valuable consideration is recited in a deed, the recital is merely prima facie evidence of the full agreed consideration and parol evidence is admissible to show that other and additional valuable consideration was to be received by the grantor such as additional money or credit on a pre-existing debt or mortgage.’
“Here, the deeds in question provide that the consideration is ‘$10.00 and other valuable consideration.’ This recitation of consideration permits inquiry into like consideration for the sale of the properties, and the Russells’ and the McLemore group’s breach-of-contract claims are not barred by the doctrine of merger.”
7 So.3d at 336. Based on our holding in McLemore, we likewise hold in this case that Southdale’s and Wheeler/Phillips’s breach-of-contract claims are not barred by the doctrine of merger, and a summary judgment on this ground was error.
Finally, we examined the language of the option agreements in McLe-more to determine whether they are ambiguous and whether “a genuine issue of material fact exists for the jury as to whether the Shelton property was part of ‘the project planned for this Property’ and, if the Shelton property is part of the project, whether, like Shelton, the Russells and the McLemore group should have been paid $12,000 per acre.” 7 So.3d at 337. After reviewing the evidence presented, the vast majority of which is identical in this case, we concluded in McLe-more:
“We agree with the Russells and the McLemore group that the language in the option agreements is ambiguous, that it cannot be resolved by rules of contract construction, and that they presented substantial evidence creating a genuine issue of material fact for the jury as to the meaning and application of the most-favored-nation clause in the option agreements. Specifically, the provisions, ‘[i]f Purchaser elects to exercise this Option the purchase price for the Property shall be determined as follows’ and ‘the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property1 are ambiguous because reasonable persons could differ on whether ‘the price per acre paid to any other landowner included in the project’ refers to a purchase price paid only by the IDB or to a purchase price paid by any purchaser for property included in the project. If the implication is that the language refers to payments only by the IDB, then the most-favored-nation clause is triggered only if the IDB paid other landowners more than it paid the sellers— the Russells and the McLemore group. If the language refers to a purchase price paid by any purchaser on property for the project, then the most-favored-nation clause is triggered regardless of whether the purchase price was paid by the IDB or another entity. Reasonable persons could differ over whether the reference to ‘price per acre paid to any other landowner’ includes by implication the interlineation of the phrase ‘by the IDB’ so that the contract means that the most-favored-nation clause is triggered only when the purchase price paid by the IDB to any other landowner exceeds the *1081 price paid to the seller. Thus, a jury question is presented. Additionally, depending on resolution of the above ambiguity, the evidence is in conflict as to whether Shelton was a ‘landowner included in the project.’ Because reasonable persons can differ on the meaning of the clause, i.e., whether the language ‘price per acre paid to any other landowner included in the project’ obligated the IDB to pay the Russells and the McLemore group $12,000 per acre and whether the Shelton property was included as part of the project site, the evidence presents questions for the jury to resolve, and the summary judgment for the IDB is reversed.”
7 So.3d at 338-39. Based on our holding in McLemore, we likewise hold in this case that the language in the option agreements is ambiguous and that the evidence presents questions for a jury to resolve. Therefore, the summary judgment in favor of the remaining project participants as to Southdale’s and Wheeler/Phillips’s breach-of-contract claims must be reversed.
IV. Summary Judgment as to Fraud Claims
Section 6-2-38(1), Ala.Code 1975, provides that fraud claims are subject to a two-year statute of limitations.
“That statute of limitations is subject to the ‘saving clause’ provided by § 6-2-3[, Ala Code 1975]:
“ ‘In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.’ ”
Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000). Section 6-2-3, Ala.Code 1975, supplies an objective test, tolling the statute of limitations on a fraud claim until the aggrieved party discovers or, in the exercise of reasonable care, should have discovered, the facts constituting the fraud. Seabol, 782 So.2d at 216; Foremost Ins. Co. v. Parham, 693 So.2d 409, 421 (Ala.1997). Therefore, the limitations period commences when the plaintiff discovers the fraud or when facts are known “ “which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry.’ ” Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1195 (Ala.2001) (quoting Jefferson County Truck Growers Ass’n v. Tanner, 341 So.2d 485, 488 (Ala.1977)).
Southdale and Wheeler/Phillips argue that they did not gain knowledge of facts that would have put a reasonable mind on notice that they should inquire further into the circumstances of the sale of the Shelton property until at least October 2002. Therefore, they argue, the statute of limitations did not begin to run until October 2002, and they filed their initial complaint in May 2004, well within the two-year statute of limitations. The project participants argue that Southdale and Wheeler/Phillips were put on notice as to potential fraud claims in April 2002 when George notified their representatives that CSX was going to purchase the Shelton property. Therefore, the project participants argue, the statute of limitations on the fraud claims ran in April 2004, and the complaint filed the following month was untimely. The trial court concluded that the statute of limitations barred the tort claims.
Although McKinney, a shareholder in Southdale, and Williams, counsel for Wheeler/Phillips, were informed in April 2002 that an option had been obtained on the Shelton property, George shared with them his understanding that CSX was to purchase that property as a transaction *1082 separate from the Hyundai project. Williams testified that he continued to seek information from. George and McNair from April through October 2002 in an effort to discover whether the Shelton option had actually been exercised at more than $4,500 per acre but that he was met with a “maze” of confusion until October 2002, when McNair referred him to Scott Abney, one of the lawyers representing the State in the Hyundai project. Abney revealed to Williams that the State, not CSX as had been previously represented, had purchased the Shelton property in August 2002 for $12,000 per acre. Williams then shared his knowledge with McKinney.
The project participants argue1 that McKinney and Williams were placed on notice on April 8, 2002, when George gave them a copy of the Shelton option agreement and informed them that CSX would be exercising the option instead of the City. They also argue that McKinney and Williams could have obtained a copy of the project agreement and read the provision in that document concerning the Shelton property. A public hearing was conducted to approve the project agreement, the project participants say, and Williams, as an attorney, and McKinney, as the probate judge for Montgomery County, were in positions in which they could have learned of the meeting. Southdale and Wheeler/Phillips argue in response that the project participants engaged in an acknowledged “ploy” to use CSX. as a straw purchaser in order to avoid the effect of the most-favored-nation clause and that this “ploy” was carefully hidden from them until several months after they sold their property for $4,500 per acre, rather than the $12,000 per acre paid to Shelton.
In Liberty National Life Insurance Co. v. Parker, 703 So.2d 307, 308 (Ala.1997), this Court stated that “[t]he question of when the party discovered or should have discovered the fraud is generally one for the jury.” The Parker Court continued, quoting Kelly v. Connecticut Mutual Life Insurance Co., 628 So.2d 454, 458 (Ala.1993):
“ ‘ “[F]raud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered.” ... However, ... documents that are vague or that do not reasonably indicate that a fraud has occurred, based on the circumstances of each case, will not “warrant a finding that the fraud claim is barred as a matter of law.’ ”
“628 So.2d at 458 (emphasis added; other emphasis omitted) (quoting Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989)).”
(Footnote omitted.)
We recently affirmed the concept that when a party discovered or should have discovered fraud is normally a question for the jury. In Jones v. Alfa Mutual Insurance Co., 1 So.3d 23, 31 (Ala.2008), we stated:
“Alfa notes that this Court has previously held that ‘ “fraud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered.”’ Kelly v. Connecticut Mut. Life Ins. Co., 628 So.2d 454, 458 (Ala.1993) (quoting Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989), overruled on other grounds, Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997)). The sentence immediately preceding the above-quoted sentence from Kelly, however, states: ‘ “The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of *1083 facts that would have put a reasonable person on notice of fraud.”’ 628 So.2d at 458 (quoting Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458, 463 (Ala.1991), overruled on other grounds, Foremost Ins. Co., supra); see also Gilmore v. M & B Realty Co., 895 So.2d 200, 210 (Ala.2004) (““[t]he question of when a party discovered or should have discovered the fraud is generally one for the jury5’” (quoting Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000), quoting in turn Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997))).”
Under the circumstances of this case, we cannot say that Southdale and Wheeler/Phillips actually knew of facts that would have put a reasonable person on notice of fraud. It is undisputed that they received from George in April 2002 a copy of the Shelton option agreement, a document running in favor of the City and assignable by the City. However, the question is whether that document should have alerted them that a fraud had occurred, especially when it was accompanied by the explanation George thought to be true but was not — that CSX was going to buy the property. We cannot say that the Shelton option agreement is a document in and of itself that would put one on notice of the fraud here alleged. Moreover, the accompanying explanation, which McKinney and Williams had no reason at the time to doubt, would lead a reasonable person to conclude that the most-favored-nation clause was not implicated because, upon the purchase of the Shelton land by CSX, Shelton would not be a “landowner included in the project.” That other documents existed or would come into existence later that would have afforded such notice does not alter the status of the document they saw — the Shelton option agreement — as a document insufficient to put them on such notice that the fraud reasonably should have been discovered. The facts presented at the time the existence of the Shelton option agreement was disclosed to McKinney and Williams, as representatives of Southdale and .Wheeler/Phillips, respectively, are not consistent with the ultimate facts: that CSX entered into a contract with Shelton for the sale of the property, which was then assigned to Hyundai and exercised by it, using funds provided by the State. McKinney and Williams were therefore not, at that time, on notice of facts that would have caused alarm when they initially learned of the Shelton option; Under these circumstances, we conclude that the question of when the fraud claims alleged by Southdale and Wheeler/Phillips accrued is a question that must be presented to a jury. Therefore, the trial court erred in entering the summary judgment as to the fraud claims on the basis that they were barred by the statute of limitations.
V. Summary Judgment as to . Each Project Participant
Even though we have concluded that whether a breach of contract occurred and whether the statute of limitations on the fraud claims was tolled are jury questions and that therefore the trial court erred in entering the summary judgments on those grounds, we may nevertheless determine whether a summary judgment is appropriate. This Court’s review is not limited to the trial court’s reasoning, and we can affirm a summary judgment on any valid legal ground presented by the record, whether that ground was considered by, or even if it was rejected by, the trial court, unless due-process constraints require otherwise. Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003).
A. The City
The City first argues that the City was not a party to the option agreements *1084 executed by the IDB and therefore was not liable for breach of contract because, it argues, the IDB was not acting as the City’s agent. Under such circumstances, the City says, it is not liable under any breach-of-eontract theory. We disagree. Pursuant to Resolution No. 111-2002, adopted by the City in June 2002 in conjunction with the Hyundai project, “the IDB did exercise the purchase options, but assigned its rights to purchase thereunder to the City and Montgomery County (the ‘County’), and the City and County each have issued debt to provide the necessary funds and have acquired the Parcels.” As the IDB’s assignee, the City assumed the obligations and liabilities of the assigned contracts. Meighan v. Watts Constr. Co., 475 So.2d 829, 834-85 (Ala.1985).
The City also argues that § 11-47-28, Ala.Code 1975, bars all claims against it. Section 11-47-23 provides:
“All claims against the municipality (except bonds and interest coupons and claims for damages) shall be presented to the clerk for payment within two years from the accrual of said claim or shall be barred. Claims for damages growing out of torts shall be presented within six months from the accrual thereof or shall be barred.”
As to the breach-of-contract claims, the City argues that the breach occurred more than two years before Wheeler/Phillips and Southdale filed their action; therefore, the City argues, those claims are barred. In so arguing, the City assumes that the cause of action for breach of contract accrued either on March 29, 2002, when the Shelton option agreement was executed, or on April 8, 2002, when the copy of the Shelton option agreement was given to Williams and McKinney, or on April 15, 2002, when the project agreement was signed, or on May 15, 2002, when Wheeler/Phillips and Southdale closed the sale of their land.
We cannot accept any of the accrual dates the City assumes. In City of Mobile v. Cooks, 915 So.2d 29, 33 (Ala.2005), we stated:
“A cause of action accrues under § 11-47-23 when an action can be maintained. Couch v. City of Sheffield, 708 So.2d 144 (Ala.1998); Hill v. City of Huntsville, 590 So.2d 876 (Ala.1991). This Court has stated the following with regard to when a cause of action accrues:
“ ‘ “The very basic and long settled rule of construction of our courts is that a statute of limitations begins to run in favor of the party liable from the time the cause of action ‘accrues.’ The cause of action ‘accrues’ as soon as the party in whose favor it arises is entitled to maintain an action thereon.” ’ ”
(Quoting Ex parte Floyd, 796 So.2d 303, 308 (Ala.2001), quoting in turn Garrett v. Raytheon Co., 368 So.2d 516, 518-19 (Ala.1979).) It is well settled that a cause of action for breach of contract accrues when the contract is breached. Stephens v. Creel, 429 So.2d 278, 280 (Ala.1983). Here, if a jury determines that the Wheeler/Phillips and Southdale contracts were in fact breached, then the earliest such a breach could have occurred would have been August 2002, when Shelton closed on the sale of her property and was paid more than Wheeler/Phillips and Southdale had been paid for their property. Wheeler/Phillips and Southdale filed their complaint in May 2004, well within two years of the date on which their cause of action for breach of contract accrued. This Court has held that the filing of an action within the six-month period in which a tort claim must be filed was sufficient presentment of the claim to comply with § 11-47-23. Die *1085 mert v. City of Mobile, 474 So.2d 663 (Ala.1985). Likewise, the filing of the action by Wheeler/Phillips and Southdale within the two-year period in which a breach-of-contract claim must be filed was sufficient presentment of the claim to comply with § 11-47-23. The breach-of-contract claims against the City are not barred by § 11-47-23.
We turn now to the tort claims. This Court has held:
“Some presentation of the claim within six months of its accrual is mandatory. Frazier v. City of Mobile, 577 So.2d 439 (Ala.1991). A cause of action accrues as soon as the party in whose favor it arises is entitled to maintain an action thereon. Buck v. City of Rainsville, 572 So.2d 419 (Ala.1990). In Diemert v. City of Mobile, 474 So.2d 663 (Ala.1985), we held that the filing of an action within the six-month period was sufficient presentment of the claim to comply with §§ 11-47-23 and -192, Diemert, at 666.”
Hill v. City of Huntsville, 590 So.2d 876, 876 (Ala.1991). In Ivory v. Fitzpatrick, 445 So.2d 262, 264 (Ala.1984), we noted that the notice-of-claim statute is not merely a statute of limitations, but is “a statute of nonclaim similar to the probate nonclaim statute.” Furthermore, a municipality cannot be held liable for the intentional torts of its employees. See § 11— 47-190, Ala.Code 1975; Cremeens v. City of Montgomery, 779 So.2d 1190 (Ala.2000).
It is undisputed that neither Southdale nor Wheeler/Phillips presented a claim to the City until they filed their complaint. This failure to file the statutorily mandated claim within six months acts as a procedural bar to all tort claims against the City. The summary judgment entered in its favor as to Southdale and Wheeler/Phillips’s tort claims is due to be affirmed on this alternative ground; however, the summary judgment entered in its favor as to the breach-of-contract claim is reversed for the reasons stated in Part III of this opinion.[7]
B. Bright
Southdale and Wheeler/Phillips argue that the trial court erred in entering a summary judgment in Bright’s favor on the basis of his State-agent immunity. Bright contends that the trial court correctly concluded that he is entitled to immunity in his individual capacity.
Southdale and Wheeler/Phillips rely on Ex parte Cranman, 792 So.2d 392 (Ala.2000), in which this Court restated the rule governing State-agent immunity.[8] The Court also stated in Cranman exceptions to that rule, i.e., when a State agent is not entitled to immunity:
“Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
[[Image here]]
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
792 So.2d at 405. Southdale and Wheeler/Phillips contend that Bright, in obtaining the option on the Shelton property, is *1086 not entitled to immunity because, they say, he acted willfully, maliciously, fraudulently, in bad faith, and beyond his authority.
Bright testified as follows in his deposition concerning his authority to obtain the option from Shelton on behalf of the City:
“Q. Before you went out and met with — and signed the Shelton option contract, did you get council approval to buy that property before you went out there?
[[Image here]]
“A. That morning, no. Specifically to do that transaction, not—
“Q. Okay,
“A. —that I recall.
“Q. And I did the math, and I’m rounding up here. But 93 acres at $12,000 an acre was about a 1.1 million-dollar commitment. Does that sound about right?
“A. If your numbers are right, yeah.
“Q. In order to spend 1.1 million of the City’s money to buy land, would you have needed authorization from the city council?
[[Image here]]
“A. Yeah, would I — I could have gotten it afterwards.
[[Image here]]
“Q. But if I’m following your testimony, when you went out there that day ... to get that option, you weren’t really concerned about the money because you knew somebody else was going to actually pay for it?
“A. Right I felt they would.
“Q. So would it be fair to say, then, you were getting this option either for the State or for CSX?
[[Image here]]
“A. I was getting an option. I didn’t know who I was getting it for. And I was signing on behalf of the mayor.
“Q. But you knew you weren’t getting it for the City?
“A. I knew I was committing the City, too, because I was putting my name as mayor on there.
“Q. You didn’t have the authority to do that for the City, did you?
“A. To my knowledge, it had not gone before the city council specifically for this transaction. Now, there may be a resolution out there giving me general authority to negotiate contracts, or a statute, as part of my job as the mayor. So that may be out there that I’m not even aware about at this point. I need to do some research to determine that.
“Q. The day you went out there to do that, it sounds to me like you knew you weren’t spending the City’s money when you got that option.
“A. You don’t know that. I didn’t know that. All I know, this was critical and important to me as mayor to deliver on behalf of the City an option to tie this property down to make the deal.”
Bright testified that he had never seen the e-mail from Hemphill; he then testified:
“Q. ... [I]f you had been given this email [from Hemphill], would you have changed the way you handled this?
[[Image here]]
“A. Let me answer. No. This was important for us to make this for our State, and I thought it — this was nothing significant that had any impression on me — impact on me whatsoever. We had paid — or the IDB had paid the landowners dou *1087 ble what it was worth already, and this was an llth-hour transaction to make the deal happen. Everybody has got to keep that in the focus.”
The foregoing testimony serves as substantial evidence that Bright was acting beyond his authority.
Although Bright denied that he was aware that the option agreements on the parcels other than the Shelton property contained a most-favored-nation clause, there is substantial evidence indicating that he was aware of the clause in the other option agreements, of the consequences of triggering it, and of his participation in the effort to circumvent it. Under the circumstances, he is not entitled to immunity as a matter of law. The trial court erred in entering the summary judgment as to the claims against Bright in his individual capacity, and that judgment is due to be reversed.[9]
Because Bright is no longer the mayor of the City, the claims against him in his official capacity are moot.
C. Strange
The May 2004 complaint alleged that the defendants named in that complaint conspired to purchase the Shelton property at a higher price than that paid to Wheeler/Phillips and Southdale in order to avoid complying with the most-favored-nation clause in the option agreements for the other parcels. Strange was not named as a defendant in that complaint. The complaint does name a fictitious defendant “A,” described as “those individuals [whether singular or plural] who made misrepresentations or participated in making misrepresentations to the plaintiffs relating to the sale or purchase of the property at issue in this case.” In the second amended complaint, Wheeler/Phillips and Southdale substituted Strange and others for fictitious defendant A. Strange argues that he was named as a defendant more than two years after the statute of limitations had expired in this case and that as to him the amendment does not relate back to the original date of the pleading. The trial court’s summary judgment in favor of the project participants was grounded on the expiration of the statute of limitations.
In their principal briefs, Wheeler/Phillips and Southdale argue that when the statute of limitations as to fraud began to run should be a question for the jury. We have so held. However, Wheeler/Phillips and Southdale did not address Strange’s relation-back argument in their principal briefs. Instead, they argue for the first time in their reply briefs that their substitution of Strange as a defendant in February 2005 was proper.
Unless we can conclude that the trial court’s order entering a summary judgment on the basis of the expiration of the statute of limitations does not involve its rejection of the availability of the doctrine of relation back of the second amended complaint, we cannot reach an issue omitted from Wheeler/Phillips’s and South-dale’s principal briefs. This Court, in Lloyd Noland Foundation, Inc. v. Health- *1088 South Corp., 979 So.2d 784, 797 n. 3 (Ala.2007), stated:
“The Foundation’s original brief to this Court addresses only the issues of res judicata and collateral estoppel. HealthSouth’s brief addresses those issues, as well as the four grounds asserted in its motion to dismiss. In its reply brief, the Foundation addresses the additional grounds argued by Health-South. This comports with this Court’s interpretation of the rules of appellate review. See Pavilion Dev., LLC v. JBJ P’ship, 979 So.2d 24 (Ala.2007) (where the trial court specifies a basis for its ruling, the appellant does not waive additional arguments not addressed in its principal brief).”
(Emphasis added.)
Because Wheeler/Phillips and Southdale did not address the doctrine of relation back in their principal briefs, and because we cannot conclude that the availability of relation back is an additional argument separate from the specified basis for the trial court’s ruling, we must affirm the summary judgment as to Strange in his individual capacity on the basis that his substitution as a defendant in the second amended complaint did not relate back to the original complaint, and, therefore, as to him, the statute of limitations had run. Because we affirm the summary judgment as to Strange on this basis, we need not address the remaining arguments as to him.
As to the claims against Strange in his official capacity as the mayor of the City, the claims sounding in tort are moot for the reasons stated in Part V.A. The breach-of-contract claims are not moot, and they remain pending. To the extent Strange is a necessary party in his official capacity to effectuate any judgment in favor of Southdale and Wheeler/Phillips against the City, he remains involved.
D. The County and the County Commission
Section 11-1-2, Ala.Code 1975, provides: “Every county is a body corporate, with power to sue or be sued in any court of record.” A county is not immune from suit, therefore, because it is a governmental entity. However, all claims against a county, whether in tort or in contract, must comply with the requirement of a presentment of an itemized, verified claim to the county commission. As this Court stated in Cook v. St. Clair County, 384 So.2d 1, 5 (Ala.1980):
“There is no restriction to the type of suit that may be brought against the county — tort or contract. The only requirements that must be met regarding a suit against a county are set out in §§ 6-5-20(a), 11-12-5, 11-12-6, and 11-12-8, Code 1975 requiring presentment of an itemized, verified claim, to the county commission within twelve months of accrual, and acted on within ninety days prior to commencement of the suit.”
It is undisputed that neither Southdale nor Wheeler/Phillips presented a claim to the County Commission at any time. This failure to file the statutorily mandated claim acts as a procedural bar to all claims against the County and the County Commission. The summary judgment entered in their favor is due to be affirmed on this alternative ground.
E. Joseph
Alabama law is clear that a county commissioner cannot be sued in his or her individual capacity. In Smitherman v. Marshall County Commission, 746 So.2d 1001, 1004 (Ala.1999), the Court stated:
“We first consider the trial court’s ruling that the county commissioners and the county engineer are not amenable to suit in their individual capacities.
*1089 The trial court relied on Cook v. St. Clair County, 384 So.2d 1 (Ala.1980), in which this Court held:
“ ‘Counties are amenable to suit in tort under Code of Alabama, 1975, § 11-1-2. Because counties, as bodies corporate, act through their governing bodies, the county [commissions, the] commissioners likewise are subject to suit in tort, not in their individual capacities but only in their official capacities.’
“384 So.2d at 7 (opinion on application for rehearing). It is therefore clear that the summary judgment was properly entered for the commissioners as to the claims against them in their individual capacities.”
(Footnote omitted.) We have not been asked to overrule Smitherman. Because Joseph, as a county commissioner, cannot, as a matter of law, be sued in his individual capacity, the summary judgment in his favor is due to be affirmed on this alternative ground.
Because we have concluded that the County and the County Commission have no liability, the claims against Joseph in his official capacity are moot.
F. Thornton
The Volunteer Service Act, § 6-5-336, Ala.Code 1975, provides, in pertinent part:
“(d) Any volunteer shall be immune from civil liability in any action on the basis of any act or omission of a volunteer resulting in damage or injury if:
“(1) The volunteer was acting in good faith and within the scope of such volunteer’s official functions and duties for a nonprofit organization, a nonprofit corporation, hospital, or a governmental entity; and
“(2) The damage or injury was not caused by willful or wanton misconduct by such volunteer.”
When the legislature passed the Volunteer Service Act, it declared in § 6-5-336(b):
“(1) The willingness of volunteers to offer their services has been increasingly deterred by a perception that they put personal assets at risk in the event of tort actions seeking damages arising from their activities as volunteers;
“(2) The contributions of programs, activities, and services to communities is diminished and worthwhile programs, activities, and services are deterred by the unwillingness of volunteers to serve either as volunteers or as officers, directors, or trustees of nonprofit public and private organizations;
“(3) The provisions of this section are intended to encourage volunteers to contribute their services for the good of their communities and at the same time provide a reasonable basis for redress of claims which may arise relating to those services.”
It is undisputed that Thornton served as an unpaid volunteer member of the IDB. He was employed full-time in his own insurance business, and he served as the chairman of the IDB on a voluntary part-time basis. The IDB is a “governmental entity” as defined in the Volunteer Service Act, § 6-5-336(c)(1). See also Harris v. Ethics Comm’n, 585 So.2d 93, 95 (Ala.Civ.App.1991), in which the Court of Civil Appeals quoted with approval a statement from a trial court’s order stating that industrial development boards “clearly reflect attributes and characteristics of a governmental entity.” Accordingly, Thornton is a volunteer under the Volunteer Service Act and is entitled to immunity so long as his actions or inactions were not wanton or willful.
*1090 Thornton and the IDB had a limited role in acquiring property for Hyundai’s plant site. Even though Thornton was the person who executed on behalf of the IDB the options to purchase the property owned by Southdale and Wheeler/Phillips, he never met with the landowners nor was he involved in the decisions concerning what property should be acquired or the price that should be paid for the property. Thornton had no knowledge of and was not present at the meeting held on the evening of March 28. He had no knowledge of and was not present at the meeting between then Mayor Bright and Shelton when Bright executed on behalf of the City the option to purchase Shelton’s property. The IDB never held an option on or title to Shelton’s property. Thornton was not involved in the actual purchase of the property. Thornton did not learn of Shelton’s identity, the price paid for her property, or that Hyundai had acquired the Shelton property until many months after the fact, long after Southdale and Wheeler/Phillips had sold their property. We conclude that Southdale and Wheeler/Phillips have not presented any evidence indicating that any actions taken by Thornton, either individually or in his capacity as the chairman of the IDB, were wanton or willful. Therefore, Thornton is entitled to immunity pursuant to the Volunteer Service Act, and the summary judgment in his favor is due to be affirmed on this alternative ground.
G. The IDB
Because we have determined that Thornton is entitled to immunity under the Volunteer Service Act, the IDB is also entitled to immunity. In Hollis v. City of Brighton, 885 So.2d 135, 141-42 (Ala.2004), the plaintiffs sued the City of Brighton, alleging that the city had failed to extinguish a fire at their house and had prevented the plaintiffs from trying to extinguish it. This Court held:
“The vicarious liability of a putative master under the rule of respondeat superior depends upon the liability of the putative servant. See Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613, 614 (Ala.1981) (“‘[W]hen [a] principal and his agent are sued in [a] joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of respondeat superior, a verdict in favor of the servant entitles the master to have the verdict against him set aside.’ ”) (quoting Louisville & N.R.R. v. Maddox, 236 Ala. 594, 600, 183 So. 849, 853 (1938)), and Gore v. City of Hoover, 559 So.2d 163, 165 (Ala.1990), overruled on other grounds, Franklin v. City of Huntsville, 670 So.2d 848 (Ala.1995) (holding that a city could not be held vicariously liable for the act of a magistrate who was immune from liability). Thus, if a putative servant is not liable, either because he is innocent or because he is immune, no liability exists to be visited upon the putative master under the rule of respondeat superior. Id.
[[Image here]]
“As discussed above, the firefighters, the putative servants in the case now before us, were volunteers who did not receive compensation for their service as volunteer firefighters. Consequently, they were immune from liability for negligence under the Volunteer Service Act. Because the firefighters were immune from liability for negligence under the Volunteer Service Act, no liability for negligence could befall them to be visited upon the City [of Brighton], the putative master in the case now before us.”
The IDB cannot be held vicariously liable for the acts of its chairman because Thornton was immune from liability under the Volunteer Service Act. The summary judg *1091 ment entered in favor of the IDB is due to be affirmed on this alternative ground.
H. The AIFA
The AIFA is a public corporation and public instrumentality of the State. See § 41-10-540, Ala.Code 1975. It was created by the legislature to fund incentives and commitments to industries that agree to locate in Alabama. By law, the governor acts as the president of the AIFA, the state treasurer as its vice president, and the finance director as its secretary. § 41-10-545, Ala.Code 1975. The AIFA argues that it is entitled to the immunity protections of Article I, § 14, Alabama Constitution of 1901, when it acts as an , arm of the State. Southdale and Wheeler/Phillips argue that the AIFA is not entitled to immunity because the legislature has given it the authority to “institute and defend legal proceedings.” § 41-10-546(2).
Nevertheless, if an action against a body such as the AIFA is in actuality an action against the State within § 14 of the Aa-bama Constitution, then the AIFA may be entitled to immunity. In Armory Commission of Alabama v. Staudt, 388 So.2d 991 (Ala.1980), this Court held that “[w]hether a governmental body is immune from suit cannot turn on labels placed on the body by the legislature” and that the “legislature may not deny immunity from suit when that immunity is constitutionally granted.” 388 So.2d at 992. The Court further stated:
“Whether a lawsuit against a body created by legislative enactment is a suit against the state depends-on the character of power delegated to the body, the relation of the body to the state, and the nature of the function performed by the body. All factors in the relationship must be examined to determine whether the suit is against an arm of the state or merely against a franchisee licensed for some beneficial purpose. State Docks Commission v. Barnes, 225 Ala. 403, 406-07, 143 So. 581, 584 (1932).”
388 So.2d at 993. The AIFA argues that it meets the three Staudt factors to entitle it to immunity as an arm of the State. As to the first factor, the AIFA contends that it is granted the authority to finance the State’s obligations to companies that bring needed industry to Aabama. As to the second factor, the AIFA contends that it is so closely intertwined with the State that it is entitled to the immunities afforded agencies and arms of the State. As to the third factor, the AIFA states that it does not negotiate or make commitments on behalf of the State, but it is authorized to fund existing commitments through the use of AIFA obligations, primarily bonds.
In Stallings & Sons, Inc. v. Alabama Building Renovation Finance Authority, 689 So.2d 790, 792 (Ala.1996), the Court stated that the Staudt test “examines the complete relationship between the state and the entity seeking immunity from suit....” The Court examined the powers delegated to the Alabama Building Renovation Finance Authority by the legislature, the relationship between the Authority and the State, and the nature of the function performed by the Authority. After examining the three factors, the Court in Stallings concluded that the Authority was not immune from suit, distinguishing the facts in that case from those found in State Docks Commission v. Barnes, 225 Ala. 403, 143 So. 581 (1932), a case relied on by the Court in Staudt.
“The facts in this case are clearly distinguishable from those found in State Docks Commission v. Barnes, a case relied on by this Court in Staudt, in which this Court held that the State Docks Commission was an arm of the state and thus immune from suit for the *1092 following reasons: the state owned the docks facilities in its own name; the Commission operated the docks facilities as an agent of the state and not as a separate entity; the funds generated by the state docks facilities belonged to the state, and in the lawsuit at issue in that case, those funds would have been subjected to liability, because ‘a lawsuit directly affecting a state contract or property right is tantamount to a suit against the state.’ Staudt, 388 So.2d at 993.”
Stallings, 689 So.2d at 793.
Article I, § 14, of the Constitution of 1901, provides: “[T]he State of Alabama shall never be made a defendant in any court of law or equity.” This Court has held that “ ‘the use of the word “State” in Section 14 was intended to protect from suit only immediate and strictly governmental agencies of the State.’ ” Tallasee-hatchie Creek Watershed Conservancy Dist. v. Allred, 620 So.2d 628, 631 (Ala.1993) (quoting Thomas v. Alabama Mun. Elec. Auth., 432 So.2d 470, 480 (Ala.1983)). After reviewing the character of the power delegated to the AIFA, the AIFA’s relationship to the State, and the nature of the function it performs, we conclude that it is a State agency for purposes of State immunity. Therefore, the summary judgment entered in favor of the AIFA is due to be affirmed on this alternative ground.
I. Then Governor Siegelman
Article V, § 112, Alabama Constitution of 1901, lists the officers embraced within the executive department:
“The executive department shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county.”
This Court recently addressed the individual liability of a sheriff in Ex parte Davis, 9 So.3d 480, 483 (Ala.2008):
“Article I, § 14, Alabama Constitution of 1901, states simply: ‘[T]he State of Alabama shall never be made a defendant in any court of law or equity.’ Although counties do not necessarily possess the same sovereign immunity as do states and state agencies, county sheriffs are executive officers of the State of Alabama and are therefore immune from liability for actions taken in executing the duties of their offices. Boshell v. Walker County Sheriff, 598 So.2d 843, 844 (Ala.1992). This Court has also recognized that a ‘deputy sheriff is afforded the same immunity from suit as a sheriff in regard to claims for monetary damages stemming from activities performed while working in the line and scope of his or her employment.’ Ex parte Purvis, 689 So.2d 794, 796 (Ala.1996).”
(Emphasis added.) If a sheriff, by reason of his or her status as a constitutional officer, enjoys immunity from liability for monetary damages stemming from activities performed while executing the duties of the office, then, a fortiorari, a governor is entitled to the same immunity. The matters made the basis of the claims against then Governor Siegelman, in his capacity as the ex officio president of the AIFA and in causing the State to fund the purchase of the Shelton property for Hyundai, stem from actions taken while he was executing the duties of his office. Alabama courts have “consistently held that a claim for monetary damages made against a constitutional officer in the officer’s individual capacity is barred by State immunity whenever the acts that are the basis of the alleged liability were performed within the course and scope of the officer’s employment.” Ex parte Davis, 930 So.2d 497, 500-01 (Ala.2005). Consequently, *1093 then Governor Siegelman is entitled, on the facts here presented, to State immunity in his individual capacity and in his capacity as the former president of the AIFA. The summary judgment in his favor is due to be affirmed on this alternative ground.
J. Then Finance Director Mabry
Then Finance Director Mabry first argues that he is entitled to State immunity because, he says, he was acting as the governor’s alter ego or deputy in reviewing and preparing the incentive package provided to Hyundai. Therefore, Mabry argues, he should be granted the same immunity the governor or a sheriff would enjoy under similar circumstances. We disagree. A deputy sheriff enjoys the immunity of the sheriff because of longstanding precedent treating the deputy as an alter ego of the sheriff.
“We must reach the same conclusion with regard to Deputies Brandon and Finley. In Mosely v. Kennedy, 245 Ala. 448, 450, 17 So.2d 536, 537 (1944), this Court stated, ‘In general, the acts of the deputy sheriff are the acts of the sheriff. The deputy sheriff is the alter ego of the sheriff.’ (Citations omitted.) In dealing with the same issue that is present here, the federal appellate court in Carr v. City of Florence, Alabama, 916 F.2d 1521, 1526 (11th Cir.1990), affirmed summary judgments for the Lauderdale County sheriff and his deputies, stating:
“ ‘[Under Alabama law, a] deputy is legally an extension of the sheriff. If the deputy’s acts are generally considered the acts of the sheriff, it is logical that those acts should also enjoy the immunity covering the sheriff’s own acts.’ ”
Hereford v. Jefferson County, 586 So.2d 209, 210 (Ala.1991). The notion that State officials serving in the executive branch are “deputy governors” has no such prece-dential footing, and we decline to create it in this proceeding. Cabinet officials are not constitutional officers, and, therefore, they are not entitled to the State immunity of a constitutional officer. See the discussion of then Governor Siegelman’s immunity in Part V.I. herein.
Mabry also argues that he is entitled to State-agent immunity because, he says, he never exceeded the scope of his duties. Mabry testified that Strange did not speak with him or with then Governor Siegelman on the evening of March 28 about Hyundai’s request, the meeting Strange convened, or his talks with CSX representatives. Then Governor Siegel-man and Mabry were apprised of 'the conversations between Strange, Hyundai, and CSX on the following day, March 29, after then Mayor Bright had obtained the option on the Shelton property. Mabry and Sie-gelman state that they did not see either the letter from Strange to Hemphill or the e-mail from Hemphill to George. Mabry’s involvement thereafter was limited to making the appropriate funds available to purchase the Shelton property on behalf of the State.
Southdale and Wheeler/Phillips presented no evidence indicating that Mabry acted outside his authority as secretary of the AIFA; therefore, he is entitled to State-agent immunity in his individual capacity. The summary judgment in his favor is due to be affirmed on this alternative ground.
Because we have concluded that thé AIFA has no liability, the claims against Mabry in his capacity as the former secretary of the AIFA are moot.
K. CSX
CSX, arguing collectively for the two corporate appellees and two individual appellees, argues that the summary judgment in its favor was proper because, it *1094 says, the amendment to the option agreements fixed the price Southdale and Wheeler/Phillips were to be paid for their land and because, it says, their fraud claims are barred by the statute of limitations, arguments we have rejected. CSX makes two brief arguments setting forth alternative bases upon which the summary judgment in its favor could be proper. It argues that the summary judgment should be affirmed because, it says, there were no unique tort damages presented here and because, it says, CSX had no duty to Southdale and Wheeler/Phillips and made no representations to them. The two CSX vice presidents with whom Strange spoke to try to arrange the purchase of the Shelton property were closely involved in the effort to purchase that property in a manner that would not trigger the most-favored-nation clause in the other option agreements. Hemphill especially was acutely aware of the reasons for having CSX purchase the Shelton property. He was the author of the e-mail describing the proposed CSX purchase as a “ploy” to avoid the effect of the most-favored-nation clause. He knew that CSX would be reimbursed in some fashion for the purchase price of the property. Hemphill testified that he went along with the plan proposed by Strange because he wanted CSX to have the railway business with Hyundai. Under the facts presented, we cannot conclude that the summary judgment as to CSX Transportation, Inc., can be affirmed on the basis that the evidence of CSX’s involvement was insufficient to create a genuine issue of material fact or on any alternative ground.
As to CSX Real Property, Inc., Evans, and Hemphill, however, CSX adopted in its appellee’s brief the arguments made by Strange in his appellee’s brief, which would include the argument that Wheeler/Phillips and Southdale’s substitution of CSX Real Property, Evans, and Hemphill for fictitious defendant A in their second amended complaint did not relate back to the claims in the original complaint and therefore came too late. For the reasons stated in Part V.C., we hold that the doctrine of relation back barred the claims against CSX Real Property, Evans, and Hemphill; therefore, the summary judgment as to them is due to be affirmed.
L. Hyundai
In McLemore, the Russells and the McLemore group argued that the summary judgment entered in Hyundai’s favor was improper because, they argued, the IDB, the City, the County, and the State were acting as Hyundai’s agents and because Hyundai was engaged in a joint venture with those entities. This Court rejected both of those arguments and affirmed the summary judgment in favor of Hyundai. Because those arguments are not made by Southdale and Wheeler/Phillips, McLemore does not provide authority upon which we can affirm the summary judgment in favor of Hyundai in this case. However, McLemore does note the paucity of evidence presented concerning Hyundai’s involvement in the matters made the basis of this action. In rejecting the agency argument, we stated:
“Nothing before us creates an inference that Hyundai participated in identifying the location of the property proposed for the project site, that it was involved in drafting the option agreements, that it met with the property owners, or that it was a party to the option agreements .... The evidence indicates that Hyundai was never involved in selecting the properties for acquisition, that it did not participate in any of the negotiations for the option agreements, and that no Hyundai representative was ever present or communicated with any property *1095 owner.... Thus, the evidence indicates that the IDB, the City, the County, and the State were not acting to acquire the properties as an agent or under the direction of Hyundai, but at their own direction and on their own initiative to entice Hyundai to build an automobile plant in Montgomery County.”
7 So.3d at 329. In rejecting the joint-venture argument, we stated:
“Hyundai never had a joint ownership interest with any of the alleged joint venturers in the property of the Russells or the McLemore group upon the closings on the property. Additionally, Hyundai did not provide financing for the purchase of the property, and it had no risk or expenses with regard to the purchase....
“Moreover, the record indicates that Hyundai did not have a right of control with regard. to how the property was obtained. Nothing indicates that Hyundai controlled the actions of the IDB or other governmental entities with regard to the selection of the property for the project site, the negotiation of the option agreements on the property, or the drafting of the option agreements. Thus, substantial evidence of right of control by Hyundai is not presented in the record.
“Although the evidence does tend to establish that a joint venture may have existed between the IDB, the City, the County, and the State for the purpose of enticing Hyundai to locate an automobile-manufacturing plant in Montgomery County, substantial evidence does not exist to create a jury question as to whether Hyundai was a participant in the joint venture. The evidence indicates that Hyundai merely evaluated Montgomery’s incentive package, compared it to the incentive packages offered by other communities, and determined that Montgomery provided the best place to build its plant.”
7 So.2d at 331-32.
The lack of evidence concerning Hyundai’s involvement in the events made the basis' of this action is just as clear. Hyundai representatives were not involved in any of the negotiations with Southdale or Wheeler/Phillips. Hyundai was not a party to any of the option agreements or amendments to the option agreements and had no role in drafting them. Hyundai was not a party to the sale transactions, was not deeded any property by Southdale or Wheeler/Phillips, and did not provide any of the funds used to acquire the land necessary for the project. Hyundai did not even participate in identifying the property ultimately used as the plant site.
Ahn testified that Hyundai was not concerned with the individual parcels that made up the land provided to it. “But actual land area, we don’t look at, because to us just provide the land, which we need. That’s it.” He made it clear that engaging in any discussions as to how property for a plant site would be obtained would weaken Hyundai’s negotiating position. Ahn testified that he would never have engaged in any discussions as to obtaining the property with State or local officials because, “at that stage, Alabama is one of [the] contenders. Either they will win,or lose. I did not allow any private discussions. Cannot happen like that.” Ahn elaborated on why he would not have been involved in any discussion concerning the methods used to obtain land: “[PJurchasing land, do this do that, it’s not my job. It’s their job. They will buy or whatever and then transfer to us.”
Hyundai never discussed with any other project participant the existence of a most-favored-nation clause in the option agreements or how that clause might be implicated in the purchase of the Shelton prop *1096 erty. Hyundai merely notified Strange that it wanted additional land in order to close the deal. Its representatives had no knowledge about the plan devised to obtain the option from Shelton, and they refused to go along with the mechanism for the purchase of the rail property by CSX proposed by Strange.
Hyundai argues that the fraud claims against it have no merit because no Hyundai representative ever knew the details about how the options were obtained or communicated with Southdale or Wheeler/Phillips. The breach-of-contract claims have no merit, it argues, because Hyundai was not a party to any contract with Southdale or Wheeler/Phillips. Hyundai further argues that it could not have formed the necessary intent to interfere with Southdale and Wheeler/Phillips’s contractual relations. Finally, Hyundai argues, the conspiracy claims have no merit because, it says, Hyundai never engaged in any concerted course of conduct with any of the other project participants but, instead, was engaged in arm’s length negotiations with them.
We conclude that there is no genuine issue of material fact as to any of South-dale’s and Wheeler/Phillips’s claims against Hyundai. The summary judgment entered in its favor is due to be affirmed on this alternative ground.
VI. Standing of Southdale
In his cross-appeal, Strange urges us to affirm the summary judgment against Southdale based on lack of standing.[10] This action was initially commenced by Southdale, LLC, and others on May 28, 2004. An amended complaint was filed on August 20, 2004. The caption of the amended complaint again referred to Southdale, LLC, as a plaintiff but added the phrase, “f/k/a Southdale, Inc.” At paragraph 3 of the amended complaint, the following appears:
“3. The plaintiff Southdale, LLC f/k/a Southdale, Inc. (‘Southdale’) is an Alabama limited liability corporation with its principal place of business in Montgomery, Alabama.1
“xOn June 24, 2002 Southdale, Inc. was dissolved and on June 12, 2002 Southdale, LLC was formed and assumed all rights to pursue this action on behalf of Southdale Inc. as provided for by Ala.Code § 10-2B-14.05(6) (1975).”
There is no § 10-2B-14.05(6) in the Alabama Code 1975. Presumably, the reference is to § 10-2B-14.05(b)(6), which provides that the dissolution of a corporation does not “[pjrevent commencement of a proceeding by or against the corporation in its corporate name.” However, because the action was never commenced in the name of Southdale, Inc., the dissolved entity, this Code section does not apply.
Strange moved to dismiss the amended complaint and alleged: “[Southdale] lack[s] standing to assert claims against Strange. [Southdale has] not alleged; or shown, that any of Strange’s conduct caused them any injury.” A subsequent memorandum in support of the motion to dismiss does not address the issue of standing. On July 11, 2006, Strange filed a motion for a summary judgment, challenging the standing of Southdale, LLC, to assert the claims contained in the complaint. In the motion Strange alleges that at the time of the commencement of the action, Southdale, Inc., had been dissolved and that South-dale, LLC, never owned the property that *1097 Southdale, Inc., the dissolved corporation, transferred to the City and the County pursuant to the option agreement.
On October 2, 2007, after a hearing on Strange’s motion on September 21, 2007, Southdale, LLC, supplemented the record by filing a document dated September 28, 2007, in which Southdale, Inc., transferred to Southdale, LLC, its assets, including any and all personal assets and choses in action arising out of any contract to sell and/or the sale of any real property by Southdale, Inc. At the same time, South-dale, LLC, filed an affidavit of Reese H. McKinney, Jr., in which he described himself as president of Southdale, Inc., at the time of its dissolution in 2002 and further stated that it was the purpose and intent of Southdale, Inc., to convey to Southdale, LLC, all of its undistributed assets — ‘“real, personal, and mixed” — retaining nothing in the corporation. Southdale did not seek permission from the trial court to file these evidentiary submissions after the hearing on . the summary-judgment motion. Strange and CSX filed motions to strike these additional evidentiary materials, citing as grounds for striking untimeliness, inconsistencies between the affidavit and the previous deposition testimony of McKinney, and hearsay.[11] Strange points out that the documents executed at the time of the dissolution of Southdale, Inc., do not refer to assignments of assets of Southdale, Inc., other than certain real property not involved in the transaction that is the basis of this action. Strange contends that actions alleging misrepresentation and deceit are personal actions that run with the ownership of the property and are not assignable. Strange argues that Southdale, Inc., as a dissolved corpo: ration, had standing to commence the action in its own name and failed to do so. The trial court never ruled on the motions to strike; instead, one month later, the trial court entered a final judgment on other grounds. The trial court stated:
“Because the Court finds that there has been no breach of contract as to [South-dale], and because all tort claims are dismissed by application of the Statute of Limitations, it is not necessary to address [Southdale’s] standing to bring this action.”
On appeal, Southdale, LLC, relies upon the transfer-of-assets document executed after the issue had been raised in Strange’s motion filed in July 2006 and after the argument on the motion in September 2007.
Strange’s motion for a summary judgment was supported by ample evidence of the lack of any interest on the part of Southdale, LLC, in the transaction that, is the basis of- this action, thereby shifting the burden to Southdale, LLC, to adduce substantial evidence in opposition. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989). The motion remained pending for over a year. Before the hearing on September 21, 2007, Southdale, LLC, offered no written response or evidence. As previously noted, Southdale, LLC, filed additional evidence after the hearing, and Strange and CSX moved to strike that evidence, noting the absence of any evidence in opposition before the hearing and the untimeliness of the evidence offered after the hearing. In its reply brief before this Court, Southdale, LLC, offers as justification for the belated submission the argument of the project participants at the hearing that Southdale, Inc., could have made such an assignment.
We do not reach the issue whether the summary judgment is due to be affirmed on the basis of Southdale’s alleged lack of standing, in view of the trial court’s having *1098 deemed it unnecessary to reach this issue and the pendency of the motions to strike the evidence belatedly offered in opposition to the motion. Its failure to reach the issue of standing explains the trial court’s failure to rule on these motions.
The trial court has discretion in deciding whether to permit a party to reopen a case and to offer additional evidence. Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38, 46 (Ala.1990). Without the exercise of that discretion in favor of the nonmovant, the failure to submit evidence in opposition to the summary-judgment motion until after a hearing on the motion constitutes a failure on the nonmovant’s part to sustain its burden. Harris v. Health Care Auth. of Huntsville, 6 So.3d 468, 477-78 (Ala.2008).
Such discretion to allow a tardy response before the entry of a judgment on the motion must ordinarily be invoked by a'motion filed under Rule 6(b), Ala. R. Civ. P. (“When by these rules ... an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion .... (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect_”). However, a response to a motion to strike can be treated as a motion under Rule 6(b)(2) and should be disposed of pursuant to the standard established therein. See Hardwick v. Sunbelt Rentals, Inc., (No. 09-CV-1106) (CD.Ill. May 13, 2009) (not reported in F.Supp.2d), dealing with the analogous federal rule (“Moving on to Plaintiffs motion to strike Union’s Answer, Plaintiff points out that, before filing its Answer late, Union failed to request leave of Court to do so under Fed.R.Civ.P. 6(b)(1)(B). Although Plaintiffs observation appears to be correct, for purposes of efficiency, the Court will construe Union’s response to Plaintiffs motion for default judgment as a Rule 6(b)(1)(B) motion for leave to file an untimely answer.”).
On remand, before reaching the merits of the issue of Southdale’s standing, the trial court must rule on the motions to strike. In view of the unsettled status of the evidence properly to be considered, an issue not yet resolved by the trial court, we decline to reach the question whether the issue of standing is an appropriate alternative basis on which to affirm the trial court’s judgment as to Southdale.
VII. Special-Master Fee
After the trial court granted the project participants’ motion to disqualify Southdale’s initial counsel, the trial court appointed a special master to oversee the transfer of files and other materials from the disqualified law firm to the replacement law firm and to review the files of the disqualified firm to determine whether there were any materials or information acquired because of Lee Miller’s affiliation with the firm following his employment with the Department of Finance in order that no such materials or information were forwarded to replacement counsel. Although the special master reported that no such materials or information was acquired, the oversight and review were time-consuming, resulting in a special-master fee of over $28,000. The trial court ordered Southdale to pay the special-master fee in its entirety.
Southdale argues that because the motion to disqualify and the subsequent efforts by the special master were initiated by the remaining project participants, the special-master fee should have been borne either entirely by the project participants or split between them and Southdale and that it is unfair to require Southdale to pay for an investigation that showed, it argues, that disqualification was not warranted. *1099 Southdale cites no authority in its brief, however, to support its argument, as required by Rule 28, Ala. R.App. P.
The inclusion of a special-master fee as an element of costs taxed against a party is “entirely discretionary, and we will not reverse unless it appears from the record, after indulging all fair intendments in favor of the ruling, that the taxation of costs was unjust and unfair. Walden v. Walden, 277 Ala. 459, 171 So.2d 851 (1965).” City of Birmingham v. City of Fairfield, 396 So.2d at 697. In Walden v. Walden, 277 Ala. 459, 171 So.2d 851 (1965), this Court stated:
“The three cases cited by appellees hold that in equity the matter of costs rests largely in the discretion of the chancellor and that the taxation of costs may be varied as the justice of the case may require. Thompson v. Bryant, 251 Ala. 566, 38 So.2d 590 [ (1949)]; Plateau Community Association v. Green, 243 Ala. 531, 10 So.2d 860 [(1942)]; and Kennedy v. Sorsby, 209 Ala. 188, 95 So. 891 [ (1923) ]. Equity usually follows the general rule at law that costs are awarded in favor of and not against the successful party in the suit. Lucas v. Lucas, 258 Ala. 515, 64 So.2d 70 [ (1953) ]; Dozier v. Payne, 244 Ala. 476, 14 So.2d 376 [ (1943) ]. An improper exercise of discretion appears when the record, after indulging all fair intend-ments in favor of the ruling, discloses the taxation of costs was unjust and unfair; otherwise, the action of the trial court should not be disturbed. Dozier v. Payne, 244 Ala. 476, 14 So.2d 376.”
277 Ala. at 462, 171 So.2d at 854 (emphasis added). In view of the trial court’s order adverse to Southdale on the issue of disqualification, we do not find the award of the special-master fee as costs in favor of the project participants to be unjust or unfair. The trial court did not exceed its discretion in ordering Southdale to pay the special-master fee.
VIII. Attorney-Client Privilege and Work Product
Wheeler/Phillips retained Williams to represent their interests and to negotiate with the IDB and others with respect to the sale of their property. In August 2007, CSX moved to compel the production of Williams’s entire legal file, including his correspondence and communications with Wheeler/Phillips. Wheeler/Phillips objected to producing the file on the ground of attorney-client privilége; Williams’s law firm objected on the ground that the file was attorney work product. The trial court found that Wheeler/Phillips had waived the attorney-client privilege because they had submitted Williams’s affidavit in opposition to motions for a summary judgment filed by the project participants and because Wheeler had submitted her own affidavit. The trial court also found that Wheeler/Phillips had waived the attorney-client privilege because they had produced a letter Williams wrote to McKinney, who was never one of Williams’s clients. The court reasoned that because Williams had negotiated with the project participants and had participated in drafting the option agreements and amended option agreements, “it is beyond dispute that attorney-client communications between Williams and Wheeler/Phillips are ' required for the truthful resolution of this case.” Relying on Rule 510, Ala. R. Evid., and Ex parte Great American Surplus Lines Insurance Co., 540 So.2d 1357 (Ala.1989), the trial court held that Wheeler/Phillips had used privileged communications “as both sword and shield,” and it ordered Wheeler/Phillips to disclose Williams’s file.
*1100 Rule 510 states that the waiver of a privilege occurs only where the holder of the privilege “voluntarily discloses or consents to the disclosure of any significant part of the privileged matter.” Wheeler/Phillips argue that they never disclosed or consented to the disclosure of any privileged information. They argue that the letter from Williams to McKinney merely sets out information Williams had learned about the circumstances under which the option to the Shelton property was obtained and the purchase of that property by the State and that it made no disclosure to McKinney of what could be considered privileged communications between Williams and Wheeler/Phillips. Although the letter to McKinney included a small excerpt from a portion of a letter Williams wrote to Wheeler/Phillips, the excerpt contained only a description of what George had told Williams and McKinney in a prior meeting and, they argue, does not constitute a significant part of the privileged communication. See Rule 510, Advisory Committee Notes (“Disclosure of an insignificant part of the privileged matter does not waive the privilege.”).
Moreover, Wheeler/Phillips argue, any waiver of the attorney-client privilege must be made by the client and cannot be made by the lawyer representing the client without the client’s consent. Swain v. Terry, 454 So.2d 948 (Ala.1984). Wheeler/Phillips maintain that there is no evidence indicating that they consented to Williams’s waiving any part of the attorney-client privilege and that he cannot be compelled to testify against them as to advice he gave them or other communications that might prejudice them in this case. Richards v. Lennox Indus., Inc., 574 So.2d 736 (Ala.1990).
Finally, Wheeler/Phillips argue, Williams’s affidavit was offered in opposition to the project participants’ motion for a summary judgment. It did not disclose any communications between Williams and Wheeler/Phillips, they say, and did not inject privileged matter into these proceedings. The affidavit merely addressed disclosures made to Williams by certain project participants or their representatives about which the project participants had already deposed him. As to Wheeler’s affidavit, she did not reveal any communication she had had with Williams except to say that he informed her in November 2002 that a higher price per acre had been paid to another landowner.
Essentially, the project participants seek information concerning what Williams and his clients knew about matters pertinent to the tolling of the statute of limitations on the fraud claims and when they knew it. That issue is critical to the viability of the fraud claims. Williams has given an affidavit submitted as evidence in this case concerning facts such as when he received a copy of the Shelton option agreement and the. steps he took to determine whether the option had been exercised. Wheeler has also given an affidavit concerning what Williams told her about the Shelton option agreement.
The trial court has granted the motion to compel Williams to produce his entire legal file. Production of the entire file sweeps too broadly; documents relating to information learned by Williams from third parties during his investigation dealing with the timing of his knowledge of alleged fraud, matters highly relevant to the issue of the tolling of the statute of limitations on the fraud claims, constitute his work product if prepared in anticipation of litigation or for trial. See Rule 26(b)(3), Ala. R. Civ. P. Of course, some of those documents might predate the time when this litigation was imminent. However, that circumstance does not preclude the status of the documents as work prod *1101 uct. See United States v. El Paso Co., 682 F.2d 530, 542-43 (5th Cir.1982) (“ ‘Mitigation need not [necessarily] be imminent ... as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.’ ” (quoting United States v. Davis, 636 F.2d 1028, 1040 (5th Cir.1981))). Only to the extent that the project participants are unable to obtain without undue hardship the substantial equivalent of information learned by Williams from third parties during his investigation are they entitled to see information in Williams’s files relating to such investigation. Ex parte Alabama Dep’t of Youth Servs., 927 So.2d 805, 809 (Ala.2005). Because it is a practical impossibility for the project participants to speculate as to all possible sources of information and to make inquiry of such sources as to contact with Williams, the order of the trial court is due to be affirmed to the extent that Williams is required to produce work product dealing with information developed from third parties with respect to the aforementioned investigation. As to communications between Williams and his clients, to the extent there has been any disclosure by Williams, there is no evidence of Wheeler/Phillips’s consent to any such disclosure. To the extent that the trial court’s order requires disclosure of other information than that allowed herein, the trial court exceeded its discretion in granting the motion to compel as to that information, and the trial court’s order is reversed as to that information.
IX. Conclusion
In case no. 1070484 and case no. 1070487, we reverse the summary judgment entered on February 22, 2006, in favor of Bright; we affirm the summary judgment entered on November 20, 2007, in favor of the City as to the tort claims asserted against it, and in favor of the County, the County Commission, Joseph, Thornton, the IDB, the AIFA, then Governor Siegelman, then Finance Director Ma-bry, CSX Real Property, Inc., Evans, Hemphill, and Hyundai; in all other respects, we reverse that summary judgment. In case no. 1070484, we affirm in part and reverse in part the trial court’s order granting the motion to compel the production of Williams’s legal file, and we remand the case for further proceedings consistent with this opinion. In case no. 1070487, we affirm the order requiring Southdale to pay the special-master fee. We also remand the case for further proceedings consistent with this opinion. In case no. 1070514, we affirm the summary judgment entered on November 20, 2007, in favor of Strange in his individual capacity-
1070484 — APPLICATION GRANTED; OPINION OF JULY 17, 2009, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
WOODALL, STUART, SMITH, BOLIN, and SHAW, JJ., concur.
MURDOCK, J., concurs in part, concurs in the result in part, and .dissents in part.
COBB, C.J., recuses herself.
1070487 — APPLICATION GRANTED; OPINION OF JULY 17, 2009, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
WOODALL, STUART, SMITH, and SHAW, JJ., concur.
BOLIN, J., concurs in part and dissents in part.
MURDOCK, J., concurs in part, concurs in the result in part, and dissents in part.
COBB, C.J., recuses herself.
*1102 1070514 — APPLICATION GRANTED; OPINION OF JULY 17, 2009, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WOODALL, STUART, SMITH, BOLIN, and SHAW, JJ., concur.
MURDOCK, J., concurs in the result.
COBB, C.J., recuses herself.

. Bobby N. Bright is no longer the mayor of the City. Pursuant to Rule 25(d), Ala. R. Civ. P., his successor, Todd Strange, is automatically substituted as a party in his official capacity as mayor. Strange was also sued individually.

. In his position as governor, Siegelman served as president of the AIFA. See § 41-10-540 et seq., Ala.Code 1975.

. In his position as finance director during then Governor Siegelman's term, Mabry served as secretary of the AIFA. See § 41-10-540 et seq., Ala.Code 1975.

. Hyundai Motor America is a wholly owned subsidiary of Hyundai Motor Company and operates as its United States division. Hyundai Motor Manufacturing Alabama, LLC, is also a wholly owned subsidiary of Hyundai Motor Company and was designated to own and operate the Alabama automobile-manufacturing plant.

. See note 1.

. The Water Works and Sanitary Sewer Board of the City of Montgomery, acting through its chairman Richard E. Hanan, also executed the project agreement, but neither the Board nor Hanan is a party in this case.

. On rehearing, the City argues that it is entitled to same immunity that is accorded the IDB. Because this argument was raised for the first time on rehearing, we cannot consider it. Dennis v. Northcutt, 923 So.2d 275 (Ala.2005).

. Ex parte Cranman, 792 So.2d 392 (Ala.2000), was decided by a plurality of this Court. In Ex parte Butts, 775 So.2d 173 (Ala.2000), the Court adopted the test for State-agent immunity announced in Cranman.

. On rehearing, Bright argues that because all actions he took in connection with obtaining the option were taken in his capacity as may- or, no claims accrued against him individually; that any tort claims against him are barred by § 11-47-23 because he was at all times acting in his capacity as mayor; and that he is not amenable to suit in his individual capacity for the same reasons as Joseph is not. Because these arguments were raised for the first time on rehearing, we cannot consider them. Dennis v. Northcutt, 923 So.2d 275 (Ala.2005).

. The other project participants joined in the argument that Southdale, LLC, does not have standing.

. The IDB and Thornton joined in the motions to strike.